No. 2927.

MARTERIANO ARCIA v. THE STATE.

1. PRACTICE—WITNESS.—Under the code of this State (Code of Criminal Procedure, art. 730) a person convicted of felony, unless such conviction has been legally set aside or he has been granted a legal pardon, is disqualified to testify as a witness in judicial proceedings.

2. SAME—SENTENCE.—The sentence, under the laws of this State, is an essential element to constitute a complete conviction, such as will work to the convict a forfeiture of his civil rights.    Under this rule the civil rights of a person against whom a verdict for felony has been returned, and a judgment thereon entered in the court below, but upon whom the sentence has not been pronounced, is not affected, and he is competent to testify as a witness in the courts of this State.   See the opinion on the question.

3. RECEIVING STOLEN PROPERTY—CHARGE OF THE COURT.—In order to constitute the offense of receiving stolen property, knowing it to be stolen, the fraudulent intent to secure profit from the act or to protect the thief, and the knowledge that the property was stolen must concur with the commission of the act.   The receiving of the property with intent to restore it to the owner without reward, or with any other innocent intent, although with knowledge that it was stolen, will not constitute the offense.   In authorizing the jury to convict without proof of the criminal intent, and in omitting to instruct correctly upon the question of intent, and finally in refusing a special charge to supply the omission, the trial court erred in this case.

APPEAL from the District Court of Webb.   Tried below before the Hon. J. C. Russell.

The conviction was for receiving stolen property, knowing it to be stolen, and the penalty assessed was a term of ten years in the penitentiary.

George L. Hartley was the first witness for the State.   He testified that he resided in the city of Laredo, Webb county, Texas, and was the resident agent of the Pacific Express Company.   On the night of June 8, 1888, a cloth sack, said to contain one thousand Mexican silver dollar pieces, was stolen from the said express office.   That sack of money was in the possession and custody of the witness at the time it was stolen.   It was taken without the knowledge and consent of the witness.   The

| | |
|---|---|
| 26a | 193 |
| 26a | 508 |
| 26 | 193 |
| 28 | 200 |
| 26 | 193 |
| 86t | 625 |
| 31 | 211 |
| 32 | 136 |
| 26 | 193 |
| 35 | 283 |
| 35 | 485 |
| 37 | 265 |
| f38 | 197 |
| 39 | 483 |

glass in the back door of the express office was broken out and the sack of money was taken out through the opening thus made. On the twelfth day of the same month all but forty-three of the said one thousand dollar pieces were returned to witness by Dario Sanchez, the sheriff of Webb county.

On his cross examination the witness said that he had lived in Laredo since February, 1888, going to that point from Fort Worth, Texas. The witness was at the post office in Laredo when the money was taken. He missed it about' nine o'clock p. m. The witness never saw the money said to have been in the sack. He never saw the contents of the sack, nor more of the property than the outside of the sack. The money did not belong to witness, but was received by him as the local agent of the express company as a consignment to C. Holck & Company, of Laredo. The name of C. Holck & Company was marked on the outside of the sack. The responsibility for the money to Holck & Company rested on the Pacific Express Company until the delivery of the consignment to them, and the witness, until such time, was responsible to the express company. Witness knew no more about the contents of the said sack than he learned from the bill of lading under which it was received, which said bill of lading designated the contents as one thousand silver Mexican dollars. He only knew by hearsay that the money returned to him by Sheriff Sanchez was part of the same money that was in the said sack consigned to C. Holck & Company. Mr. Ludlow was the agent of the company in San Antonio. Witness could not say whether or not Ludlow consented to the taking of the said money. Witness left his office door closed when he went to the post office. He did not see the money taken from the office.

Re-examined, the witness said that the sack returned to him with the thousand (less forty-three) dollars was a sack of the same kind as that which was taken away with the money. There was still a little wax on the sack when it was returned. The money taken was worth seventy-five cents on the dollar.

Re-cross examined, the witness said that the sack, when returned to him, had no name or other writing on it. All he knew about it being the same sack that was taken, was that the little wax still adhering to it looked like the wax of the original seal. Most of the express companies use different colored wax.

Yginio Garcia was the next witness for the State. He testi-

fied that, as deputy sheriff, he received a warrant to search the premises of one Cecelia Salazar, the mistress of Enrique Renteria, from whom the defendant was charged to have received the stolen money. The witness and his attendant found five hundred and odd Mexican silver dollars buried in the yard of the said Cecelia Salazar. The said money was in a sack when found, and was turned over by the witness to Sheriff Sanchez. Witness afterward returned to Salazar's house and found twenty-one dollars more. Renteria lived at the house of the said Cecelia Salazar. The defendant's correct name was Marteriano Arcia, and by that name, and as the son of Pasqual Arcia, the witness had known him since he was four years old. Renteria and his companion were both arrested, and Renteria was sent to jail by the defendant, who was a deputy sheriff and knew the cause of the arrest of Renteria.

Cross examined, the witness stated that he had never known the defendant by any other name than that of Marteriano Arcia. He had seen the defendant write, but never observed his sign manual to see how he spelled his name. The sack recovered by the witness with the money in it had on it fragments of red wax, such as is commonly used by express companies for sealing purposes. It showed also three circles about the size of a twenty-five cent piece. Witness did not remember that there were any letters or figures on the sack. Cecelia Salazar showed the witness the spot in her yard where the bag of money was buried. The witness never saw the sack until he got it from the place shown him by the woman Salazar. The circles spoken of by the witness indicated that the sack, when intact, and before it was opened had three seals on it. Renteria was sent to jail from the mayor's office by the defendant, as likewise was another man a short time before. The witness did not know why Arcia sent them to jail, but he knew that Renteria and the man were detained at the mayor's office for the purpose of examining them with the view of getting information about the money stolen from the express office.

Jose Maria Castro testified, for the State, that he had known the man Enrique Renteria for a short while. The witness, while passing along the street near the Pacific express office in Laredo, between eight and nine o'clock on the night of the day alleged in the indictment, saw Enrique Renteria drop a sack out of the express office door, and then come out of the said office and pick up the sack and walk off. Witness heard the

jingle of silver money when the sack fell, and recognized the man Renteria when he came out of the office and went off with the sack. He next saw Renteria at the market house in company with the sheriff, and identified him. He did not know the defendant, and had no recollection of seeing him on the night of the burglary.

Enrique Renteria testified, for the State, that he knew all about the burglary of the Pacific Express office in Laredo on the night of June 8, 1888. He was, himself, the identical individual who committed that burglary. The property secured by him on that occasion was a sack containing about one thousand Mexican silver dollars. Witness took the sack of money to his house as soon as he secured it, and within the next three hours was arrested for the burglary. Defendant took witness to the market house about three o'clock on the next morning, and thence to jail. When arrested, the witness repeatedly protested to the defendant that he knew nothing about the money. It was evident, however, that the defendant knew witness had the money, for he asked the witness to tell him where it was, and promised, in consideration of such information, to get witness off on a lighter sentence than he would otherwise get. Witness finally got the defendant to go with him to his house, where he gave the defendant some of the money. Defendant took the money thus given him, and which the witness had got from the sack he had taken from the express office, and put it in his pocket and a belt. The money had not been buried when defendant came to witness's house and got part of it, but was in a tin can in the kitchen, where witness put it when he first got home. Witness offered the defendant all of the money for his release, but defendant declined the offer. It was about five o'clock when witness gave the defendant the money. Defendant then took witness back to jail, reaching the jail about day light.

On his cross examination, the witness stated that he gave the money to the defendant in the kitchen and in the presence of the woman Salazar. There was then no light in the kitchen, but there was a lighted candle in the next room. Witness did not give Salazar a cent of the money, nor was she in any way a party to the transaction between witness and defendant. The witness opened the sack before he was arrested; first put it in the trunk in his room, but then took it to the kitchen and put it in a tin can. Witness denied that he ever, in jail or elsewhere,

told Tomas Arispe or any other person that another person than himself was concerned in the burglary, and that such person has escaped across the Rio Grande with part of the money. When the witness last saw the money not given to defendant it was in the tin can in the kitchen, and had not been buried.

Cecilia Salazar, for the State, corroborated the testimony of the witness Renteria as to the visit of the defendant to her house, with the said Renteria early on the morning of June 9, 1888, and the payment at that time of a part of the money by Renteria to defendant. She stated, as did Renteria, that the latter got the money from a sack in a tin can in the kitchen, and that, upon receiving the money, defendant put it in his pockets and in a belt.

Deputy Sheriff Eugenio Yglesias testified, for the State, that, becoming satisfied that the defendant had part of the money stolen from the express office, he and Sheriff Sanchez concocted a scheme for his detection and the recovery of the money. In accordance with that plan he accosted the defendant in the jail yard and told him that if he would tell where the balance of the money (that not recovered from Renteria) was, he, witness, would help him out of the difficulty, and to do so he would tell Sanchez that he, witness, had found the money, and that defendant had assured him that he was not guilty. Witness then told defendant what the woman Salazar had said about his receiving part of the money at her house. Defendant then agreed to disgorge, and told witness he would find a part of it in a handkerchief buried at the foot of a telephone post near the jail, and the balance of it in his belt at a certain store, for which he gave the witness a written order. Witness dug up the handkerchief at the point indicated by defendant, and found it to contain three hundred dollars. He got the belt on defendant's order, and found it to contain one hundred and twenty dollars. He found about twenty dollars more of Mexican money and five dollars in American money on the person of defendant. About an hour after the defendant's arrest, and while he was in jail, he told witness that he took and kept the money for the purpose of tracing the balance and discovering what other parties were concerned in the burglary.

Several of the witnesses for the State testified that they had known the defendant for years, and had always known him as Marteriano Arcia, and by no other name.

The State closing, the defense introduced the sheriff, who tes-

tified that, for the two years the defendant had been under him as deputy sheriff, he had known him as Marteriano *Arce.* During that time defendant had signed his name to letters to witness (which were produced in evidence) as Marteriano Arce. Had witness been questioned by the grand jury, when before them, he could have told them that defendant's surname was *Arce,* and not Arcia. Senor Morel testified as did Sheriff Sanchez, as to the correct surname of defendant.

In rebuttal of Renteria's testimony, in part, the defense introduced Tomas Arispe, who testified that he was in jail on the morning that Renteria was confined, and that on that morning Renteria informed him that he told the defendant that another party who was engaged in the burglary had escaped across the Rio Grande, and that the defendant was making his arrangements to arrest that party on his return.

*Coopwood & Son,* for the appellant: We insist that the trial court erred in permitting the witness Renteria to testify in behalf of the State, over our objection; and we submit, in this connection, as a legal proposition, that a person twice convicted of felony on his *pleas of guilty,* with no notice of appeal from either judgment, but with both judgments and verdicts standing of record in full force, is not competent as a witness, notwithstanding the formal sentence has not been pronounced or entered of record.

Primarily, the charge of the court to the jury was erroneous, in that it omitted to instruct them that a fraudulent intent on the part of the accused, in receiving the property, was essential to constitute the offense of receiving stolen property, knowing it to have been stolen; and, as framed, in authorizing a conviction upon mere proof that, when he received the property, he knew it to have been stolen. This error was aggravated by the refusal of the trial court to give the special charge to supply the omission, requested by the defense, which special charge reads as follows:  *  *  *  "The offense charged in the indictment is receiving stolen property, alleged to be the property of George Hartley, and to have been stolen from him. You are instructed that the burden of proof is upon the State to prove that the money belonged to, and was the property of, George Hartley; that it was stolen from him, and that the defendant received it from Enrique Renteria, knowing it to be so stolen, with the intent to deprive said George Hartley of the

value thereof, and to appropriate the same to his own use; and unless you shall find from the evidence that the State has proved each of these facts to your satisfaction, beyond a reasonable doubt, you should find your verdict in favor of the defendant."

*W. L. Davidson,* Assistant Attorney General, for the State: The competency of the witness Renteria, who was permitted by the trial court to testify in behalf of the State, must, I take it, be determined by the construction, conjointly, of Article 27 of our Penal Code, and articles 730 (sub div. 5), 791, 792, 793 and 794 of our Code of Criminal Procedure.

As a rational proposition, I would say that nothing in the form of a "conviction" could be a "conviction" under our statute until the indicted party could be legally called a *convict.* It is this that makes the party infamous under our laws, and he is not infamous until under the law he has been legally pronounced a convict. That constitutes the end of his prosecution, and is the final judgment. It is the final judgment that renders infamous, and not the crime. (1 Bish. Cr. L., sec. 975.) "A verdict of guilty, without judgment, is not a conviction." (Whart. Cr. Ev. (3 ed.), sec. 489; Bouvier's Law Dic., words "judgment" and "sentence.")

In our State no judgment final, in its broadest sense, can be rendered, so as to make the party infamous, until he has had the highest court of the land to which he can and has applied for the trial of his cause, to pass thereon. (Penal Code, Art. 27.) If he does not choose to appeal, then the sentence is the final judgment. Until that has been pronounced, his cause may be set aside, and a new trial awarded. Until then the judgment may be arrested for various reasons. Until the sentence has been pronounced an appeal can not be prosecuted, except where the death penalty has been assessed, and there is no final judgment in that court. Until then the party can not be sent to the penitentiary to endure the punishment assessed by the jury. Until then the judgment can not be final. Where the party appeals, the sentence is held in suspension, and may be set aside. Any of the matters recited would vacate the judgment—either the granting the new trial, arresting the judgment, or reversing it by this court.

Article 27 of our Penal Code takes one step in advance of our sister States in the protection of the citizen, and in shielding

his innocence. As far back as 16 Texas, in Burrell's case, it was held that the sentence was the real judgment, and the judgment proper was held to be merely formal to enable the party to appeal. (16 Texas, 147.) Since then our law has been amended to make the sentence the final judgment and prere. quisite to an appeal in felonies less than capital. Then, it is submitted, under these statutes, that in order to render a conviction of a party destructive of his right to testify, in our courts, the judgment must be final, and that no judgment of conviction is final until sentence passed. Such I believe to be the law of Texas, and such the intention of our law makers, in passing the statutes recited.

The term "conviction," as defined by, or meant to be understood, under our statute, can hardly be interpreted under the decisions of other States, or the laws of said States. We can gain but little light from them. We must look to our laws and codes, for the meaning of the term. In examining the decisions of the other States that have statutes on these questions, it will be found, I apprehend, that they will furnish no safe rule, because of the difference between those laws and our own. It is certain, however, that our laws furnish the rule to govern us, and that we can not resort to other laws for a rule, unless ours fail in this respect. They may, however, assist us in arriving at correct conclusions, and, to this extent, are strongly persuasive in construing our own statutes, and determining rules in our courts in passing on these statutes.

The North Carolina Supreme Court say, in this connection, that "infamy of character does not render any one incompetent as a witness, nor does the commission of any crime, however atrocious, though acknowledged. (Citing 8 East, 97, 98.) His guilt, to work that effect, must be legally ascertained by conviction, and that followed by a judgment. The judgment may have been arrested, and the conviction thereby rendered a nullity, as if it never had an existence. It is not the conviction, then, but the judgment, which creates the disability." (The State v. Valentine, 7 Iredell, 227.)

The Indiana Supreme Court held that the conviction, by the jury, did not render the witness incompetent. "But," they say, "judgment and sentence had not passed against him; and it is the judgment of the court, and not the verdict of the jury, that renders the accused legally infamous, and, hence, incompetent

as a witness." (Dowley v. The State, 4 Ind., 128. To the same effect see the People v. Whipple, 9 Cowan's Rep., 708, 709.)

In McLean's Reports this language is found, to wit: "The jury being sworn, in the course of the examination of the witness, Bostwick, who was the driver of the mail stage at the time the mail is charged to have been robbed, and who, having been indicted for the same at the present term, pleaded guilty, was offered as a witness by the prosecuting attorney, and the court held that, sentence not having been passed on him, he was a competent witness." (United States v. Dickinson, 2 McLean, 329.)

The main question in these cases is the finality of the proceeding, and the fixing of the status of infamy. Until that is done the person condemned by a verdict and judgment only is a competent witness. The law does not stamp the brand of infamy until the last remedy or right has been exhausted. It will not presume, because the verdict has been rendered, and the proper judgment has been entered, that he is infamous. The sentence remains; the motions for new trial and in arrest of judgment are still guaranteed, and the appeal is his last refuge; and until this has been decided adversely to him, if resorted to, he is not infamous. Any of these being resorted to may be decided in his favor, and he is not infamous if favorably decided. The books are full of illegal convictions and erroneous judgments and sentences annulled, set aside, vacated and reversed, and this, to some extent, even where pleas of guilty have been entered. Even in pleas of guilty, our laws throw the shield of protection around the defendant, and require certain matters to appear. If these do not so appear the case, on appeal, will be reversed. (Code Crim. Proc., arts. 518, 519; Saunders v. The State, 10 Texas Ct. App., 336; Wallace v. The State, Id., 407; Frosh v. The State, 11 Texas Ct. App., 280; Harris v. The State, 17 Texas Ct. App., 559; Paul v. The State, Id., 583; Turner v. The State, Id., 589; Landers v. The State, 18 Id., 372.) It is the rights, liberty and character of the citizen that is so strictly guarded.

In the case at bar, as in Dickinson's case, 2 McLean, supra, the witness pleaded guilty, and, as in that case, no sentence had been passed on the witness. There was no final judgment. The judgment against the witness was entered in this case, but no new trial had been urged, nor had any motion in arrest been presented, nor had the sentence been passed upon him. There

the matter rests. I submit that, until sentence had been passed, the witness was competent. Even after sentence passed he would still be competent if he prosecuted his appeal, and would so remain till this court affirmed his case. Suppose he had appealed after his sentence and this court should have reversed the case, what would have become of appellant's idea of infamy? Until he decides not to prosecute these rights he is not infamous, and no other party can urge that he will or will not do so until his "day of grace" has passed. It is not shown that he would not avail himself of these things, and therefore the court did not err in this matter.

I might refer further upon this question as to infamy, and what constitutes it, to Mr. Bishop, who says: "Practically the infamy, like the forfeiture under the old common law, comes neither from the mere crime nor from the verdict of guilty, nor from the punishment, nor from the infamous nature of the punishment, but from the final judgment of the court. Until judgment rendered, the person indicted, or even convicted, is competent to testify." (1 Bish. Cr. L., sec. 975, 2 to 6.) He holds that the judgment final is sufficient until reversed. Under our Penal Code, article 27, when construed with the other statutes cited, I doubt this last proposition as governing the said statutes. But upon the proposition that it takes a final judgment to render the witness incompetent to testify, there is no doubt of the correctness of the position assumed. I submit, also, that the final judgment, in Texas, can not be other than the sentence, for it alone makes a finality of the case, in the trial court, as we have already seen.

The infamy is not attached to a defendant on conviction as a means of preventing, simply, the party from testifying against some other party, who is also indicted and being tried. The disfranchisement is a consequence of the final judgment, and an incidental punishment for a heinous violation of law. The leading punishment is the penalty as denounced by the statute, and the deprivation of civil rights of the convict is an incidental punishment. These incidental matters are made to depend upon the sentence, for until that has been, by the court, pronounced, the main punishment can not be inflicted, and until that can be inflicted the incidental matters can not and do not attach. The object of these punishments, and of the deprivation of civil rights, is to punish crime and reform the offender, and not to give other criminal causes a charter right in the dis-

grace of the punished culprit. These matters are held over the citizen as a means of terror to him to deter him from the grosser violations of the law, and from invasion of the rights of other members of society. It does not say to the violator of the law, if you do this, or that, you shall not testify against your neighbor, but it says to him, if you do these prohibited acts, you shall be punished by death or imprisonment in the penitentiary, and that punishment shall carry with it, and incidental thereto, the deprivation of certain civil privileges and rights theretofore enjoyed by, and guaranteed to you under existing laws. Any other citizen has no right guaranteed to him in the disgrace of the criminal. The disgrace attached to the sentence merely affects a remedy, or matter of procedure, or the rules of evidence, and the citizen has no interest, from the standpoint discussed in this matter, until the final judgment or sentence has declared him a felon and officially placed the punishment of violated law upon him. The approval of the verdict does not do this. It is the sentence of the court, ordering the execution of that verdict, that fixes the *status* of the convicted man and locates the infamy.

If the party is objected to as a witness after he has served a term in the State's prison, the introduction of the verdict and the judgment of approval would not be sufficient to eliminate his testimony. The sentence must be shown also, and then he is not permitted to testify, unless the pardon is produced, or the reversal of the sentence and judgment is presented. This is the universal practice, and is strongly persuasive as to the construction placed on these statutes. It is also strongly suggestive as to the construction of our statutes generally held by the profession as to what the final judgment is under those statutes, and that those statutes make the sentence the final judgment. I submit that no lawyer in this State would, in establishing the incompetency of a witness, who had been convicted of a felony, imagine that that proof had been made until the sentence was offered as, and made, a part of the testimony before the court, and that the proof would be incomplete without it. The very judgment itself in this case shows it is not a final judgment. It approves the verdict and then commits the defendant to the "common jail of Webb county, there to await the further orders of this court." Still there is something to be done before the judgment is complete. There are orders to be made. The motion for new trial is to be passed on The mo-

tion in arrest of judgment has to be decided. There is, if these two motions are overruled and the "orders" entered, the sentence to be pronounced against the defendant. Even before this can be done the defendant must be asked, and the judgment show, what he has to say why the sentence of the law should not be pronounced. These are all parts and parcels of the case. Some of them may be waived and others not. The sentence must be pronounced.

WILLSON, JUDGE.  When the witness Renteria was placed upon the stand by the State, the defendant objected to his testifying, upon the ground that he was a convicted felon, and was therefore an incompetent witness. In support of the objection defendants proved that said witness had been tried for, and found guilty of, felonious theft, and also of burglary, and by proper judgments of the court, had been adjudged guilty of said felonies. It further appeared, however, that sentence had not been pronounced against the witness upon either judgment, at the time he was offered as a witness, and the trial court therefore overruled defendant's objection to the competency of said witness, and permitted him to testify. This ruling of the court was excepted to, and is insisted upon as error by defendant's counsel.

A conviction of a felony, unless such conviction has been legally set aside, or unless the convict has been legally pardoned, renders such convict incompetent to testify as a witness. (Code Crim. Proc., art. 730.)

But the question here presented is, had the witness, at the time he was offered as such, been convicted of felony, within the meaning of our code, sentence not then having been pronounced against him. In the absence of any statutory provisions affecting this question, we would hold, in accordance with what seems to be the well settled rule, that a verdict followed by a judgment, renders the conviction complete, and the disqualification at once attaches, but in no case attaches until judgment has been rendered upon the verdict. (Desty's Am. Cr. Law, 49 b, note 11; 1 Whart. Ev., sec. 398, note 6.)

There are, however, some peculiar provisions in our code, which, we think, require more than a verdict and judgment to be shown, in order to establish a forfeiture of civil rights. Under our code, in all felony cases, a sentence must follow the judgment. This sentence is distinct from, and independent of,

the judgment, and is, in fact, the *final* judgment in the cause. It must be pronounced and entered in all felony cases, except in a capital case, when the death penalty is assessed, before an appeal can be prosecuted. (Code Crim. Proc., arts 791, 792, 793.) It is the sentence, therefore, and not the judgment, which, under our code, concludes the prosecution in the trial court, and until it has been pronounced it can not be said that the conviction in the trial court is complete, so as to work a forfeiture of civil rights. If, after sentence has been pronounced, no appeal is taken, the conviction is complete, and its consequences attach and operate at once. But if an appeal be prosecuted, the effect of the appeal is to suspend and hold in abeyance the enforcement and legal consequences of the conviction until the judgment of the court of last resort has affirmed the conviction had in the trial court. (Code Crim. Proc., art. 849.) This view is confirmed by article 27 of the Penal Code, which reads: "An accused person is termed a 'convict' after final condemnation by the highest court of resort which, by law, has jurisdiction of his case, and to which he may have thought proper to appeal."

Looking, therefore, to the provisions of the code which we have cited, and considering and construing them together, we are of the opinion that the trial court did not err in holding the witness Renteria to be competent to testify.

To constitute the offense of receiving stolen property, knowing the same to have been stolen, the act of receiving or concealing must be accompanied by a criminal intent, an intent to aid the thief or to obtain a reward for restoring the property to the owner, or an intent to in some way derive profit from the act. There must be a *guilty* knowledge, a fraudulent intent concurrent with the act. (Nourse v. The State, 2 Texas Ct. App., 304.) If the property was received or concealed with the purpose and intent of restoring it to the owner without reward, or with any other innocent intent, the mere knowledge that it was stolen property would not make the act criminal. (Desty's Am. Crim. Law, 147e.)

In his charge to the jury the learned judge overlooked this essential element of the offense, omitting entirely to instruct the jury that such intent was necessary to constitute the offense. Under the charge as given the jury was authorized to convict upon proof that the property was stolen and that the defendant received or concealed it, knowing that it was stolen,

although they might not have believed from the evidence that he received or concealed it with criminal intent. This defect in the charge was specifically pointed out and excepted to, and was also sought to be corrected by a requested instruction, which was refused. We can not, therefore, inquire as to the effect which may have been wrought by the error. It may have been harmless to the defendant, and, had it not been excepted to, might not be error for which the conviction would be disturbed. But, presented as it is, by proper bill of exception, we must, because of this error, reverse the judgment.

Other exceptions were reserved to the charge, all of which we have carefully considered, but in our judgment they are not maintainable. With the exception of the single error above specified we think the charge of the court is correct and unobjectionable; but for that error the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Opinion delivered October 24, 1888.